UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT GERARD PLUMMER,

                Petitioner,

                                        Case No. 06-CV-15189

vs.

                                        HON. GEORGE CARAM STEEH

ANDREW JACKSON, Warden,

                Respondent.

_____/

ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS
AND DENYING CERTIFICATE OF APPEALABILITY

Robert Gerald Plummer, a Michigan prisoner, filed a petition for the writ of

habeas corpus on November 21, 2006, pursuant to 28 U.S.C. § 2254, challenging his

April 16, 1996 jury conviction in Berrien County Circuit Court for first-degree

premeditated murder, assault with intent to commit murder, and possession of a firearm

during the commission of a felony.  In his petition, Plummer alleged that his trial counsel

provided ineffective assistance when he failed to fulfill his promise during voir dire that

Plummer would testify in a theory of self-defense or defense of others.  After this court

denied Plummer's petition, the Sixth Circuit remanded for an evidentiary hearing to

determine the facts surrounding Plummer's decision not to testify.  Specifically, the

Sixth Circuit found an issue of fact as to "whether, at the time of voir dire, Plummer

intended to testify and whether his counsel believed Plummer intended to testify."

(Doc. 39 at 17).

-1-

On January 10, 2013, this court held an evidentiary hearing.  At the hearing, Plummer testified that he never intended to testify under a theory of self-defense. Plummer's father, Robert L. Plummer,[1] also testified to the same.  Plummer's trial attorney, Robert McDowell, testified by way of a video deposition, that leading up to trial, Plummer admitted to shooting the decedent in self-defense, and intended to testify, but had a sudden change of heart in those decisions during trial.  The parties submitted post-hearing briefs.  After the evidentiary hearing, the court granted Plummer's motion for discovery, limited to the purpose of deposing his original attorney in the matter, James Jesse.  The parties deposed Jesse on May 16, 2013, and submitted his deposition testimony to the court.  Petitioner filed his supplemental brief on June 24, 2013, and Respondent filed his supplemental response on July 16, 2013. Having carefully considered the testimony given at the evidentiary hearing, depositions, and the parties' briefs, this court finds that McDowell's testimony was credible, and for the reasons stated below, the court shall dismiss the petition.

BACKGROUND

A.    The Underlying Facts

In a published opinion, the Michigan Court of Appeals summarized the facts adduced at trial as follows:[2]

> During the early morning hours of September 18, 1995, defendant and his brother, Mark Plummer, were at the New Image Lounge in Niles. Defendant was wearing a black leather jacket.  The decedent, Damon

---

[1]For ease of reference, Plummer's father shall be referred to as Robert Sr.

[2]The Michigan Court of Appeals refers to petitioner's brother as Plummer and petitioner as defendant.

Hatcher, was also at the New Image Lounge along with several of his relatives, including Kevin Day.

Around 1:30 a.m., Day and Plummer began arguing in the pool room. Defendant and the decedent were also in the pool room at that time. A witness, Israel Bennett, testified that Day and Plummer exchanged words, and then Day struck Plummer in the jaw with his fist, causing Plummer to fall to the floor. Plummer returned to his feet, attempted to retaliate, and was again struck by Day. When Plummer went down, defendant tried to step in to help but Bennett stopped him, indicating that the fight was between Day and Plummer. Bennett then observed defendant hesitate for a moment, pull out his pistol and hold it at his side, give a threatening look to Bennett, and subsequently turn to focus on his brother, who was lying on the floor with Day standing over him. Just then, the decedent ran from the other side of the bar toward Day, yelling, "Man break that up." The decedent approached with his hand extended to push Day back, but tripped and fell against the wall. As the decedent attempted to stand, defendant "panicked," raised his pistol and shot at the decedent's back, striking him in the left shoulder. Defendant then pulled Plummer from the floor and ran out the door with his pistol still in hand.

Marcus Hatcher, the decedent's cousin, testified that he observed the decedent run toward Day and Plummer and saw him trip and fall. Hatcher stated that after this occurred, defendant moved his hand so that the gun was aimed in a downward direction and fired, striking the decedent. Defendant fired a second shot, then grabbed Plummer and ran, "looking real paranoid like." As he left the bar, defendant fired a third shot "[l]ike he was shooting at somebody."

Christine Jolliff testified that she was in the New Image Lounge at the time of the incident. Jolliff observed defendant holding a gun and subsequently heard gunfire. As she tried to flee, Jolliff looked down, saw blood coming from her leg, and realized that she had been shot. Day testified that Plummer was drunk at the time of their altercation. Plummer confronted him, apparently about a woman, and the two "commenced to arguing." Day explained that he hit Plummer only after Plummer began to raise his hand against Day. After Day struck Plummer, Day heard someone say, "He has a gun." Day turned, saw the gun in defendant's hand, and ran. Day heard two shots and was near Jolliff when he saw that she had been struck in the leg.

Clint Woods testified that he saw two black men arguing with Day at the New Image Lounge.  He then witnessed one of them, who was wearing a black leather jacket, use a black gun to shoot the decedent and a female patron.

Kevin Scaife stated that he witnessed a man in a black leather jacket chase Day out of the pool room as he shot at him.  Scaife believed that the man was aiming at Day when he shot a woman in the leg.

Michigan State Police Trooper John Moore testified that he was called to the New Image Lounge at approximately 1:30 a.m. or 2:00 a.m. for crowd control purposes. Shortly after his arrival, he observed a sudden surge of people running from the bar, some yelling that there had been a shooting inside.  Moore stated that as one of the female patrons fled from the building, she identified a man in a black leather jacket as the shooter. Moore then ordered the man, whom he identified as defendant, to the ground.  Defendant briefly lowered himself but then rose again and took several additional steps.  However, defendant complied when Moore again ordered him to stop, and Moore and Officer Jimmy Kidwell of the Niles Police Department then took defendant into custody.

Kidwell testified that when he and Moore were attempting to apprehend defendant and his brother, he observed defendant stoop and throw something underneath a parked car.  After defendant was taken into custody, Kidwell went back to the location where he had seen defendant bend down and retrieved a .25-caliber gun from underneath the car.  Defendant told Kidwell that the gun did not belong to him.

Officer Fulton Moore of the Niles Police Department reported that when he booked defendant he discovered a gun holster hooked over defendant's belt and situated between his pants and his shorts. Defendant told Officer Moore that outside the bar, he had tripped and the gun had fallen out of the holster.  Detective James Merriman, also of the Niles Police Department, reported that a preliminary breath test indicated that defendant's blood-alcohol level was 0.10 percent.

Pathologist John Landgraf testified that he had performed an autopsy on the decedent.  The decedent had sustained a gunshot wound to his upper back. The bullet pierced the decedent's aorta, and he bled to death.

Stuart Burritt, a firearms expert, testified that in his opinion the gun was less than fifteen inches from the decedent's body when the fatal shot was fired. Burritt also reported that he examined two .25-caliber shell casings retrieved from the scene, along with the bullet found on the floor

of the bar and the one retrieved from the decedent's body. Burritt could not say with certainty whether the shell casings had been fired from the .25-caliber pistol found by Kidwell. However, Burritt believed that the two bullets had been discharged from the same weapon, and that they could have been fired by the .25-caliber pistol. In addition, Burritt noted that there were "gross similarities" between the markings observed on the spent shell casings found at the scene and those observed on the casings subsequently fired from the suspect pistol.

People v. Plummer, 581 N.W.2d 753, 755-56 (Mich. Ct. App. 1998).

In its opinion, the Sixth Circuit summarized the facts surrounding Plummer's

claim that his attorney misrepresented his intention to plead self-defense in voir dire,

and the procedural posture of this case post-conviction as set forth below:

During voir dire, Plummer's counsel told the jury that Plummer, and other witnesses, would testify in support of a theory that Plummer shot Hatcher and Joliff in self-defense. Specifically, Plummer's counsel stated to the jury:

The judge has told you the charge here is one of murder, and Robert Plummer has entered a plea of not guilty to that charge. He is going to testify, and you will hear other witnesses testify in this regard, that on the date in question he believes he was acting in lawful self-defense of both himself and his brother that was with him in the bar.

However, at the end of the prosecution's case in chief, Plummer's counsel told the trial court that "to this point [Plummer has] indicated to me that he was prepared to testify. At - just at the lunch break he's informed me that he doesn't wish to testify." The trial court then conducted a colloquy on the issue with Plummer, inquiring whether Plummer was satisfied with his counsel's work, whether he understood his constitutional right to testify or not testify, and whether he understood certain consequences of his decision to not testify. Contrary to his counsel's earlier promise to the jury, Plummer did not testify. Because Plummer did not testify, his character witnesses were also not able to testify.

Plummer's counsel presented two arguments to the jury at trial: first, that the prosecution had not proven that Plummer was the person who shot Hatcher and Joliff, and second, that, if Plummer was in fact the shooter, he had acted in self-defense. The jury found Plummer guilty.

-5-

Plummer was convicted in Michigan state court of first-degree murder, assault with intent to murder, and possession of a firearm during the commission of a felony. Plummer filed a direct appeal with the Michigan Court of Appeals, claiming ineffective assistance of counsel and insufficient evidence to support the jury verdict of first-degree murder. The Michigan Court of Appeals declined his motion for an evidentiary hearing on his claim of ineffective assistance, but, finding merit to his second argument, remanded to the trial court for entry of a judgment of conviction of second-degree murder. On remand, he was sentenced to concurrent terms of twenty to eighty years' imprisonment for second-degree murder, ten to eighty years' imprisonment for assault with intent to murder, and two years' imprisonment for possession of a firearm during the commission of a felony. The Michigan Court of Appeals affirmed this sentence, and Plummer filed an application for leave to appeal in the Michigan Supreme Court. This application was denied.

In 2002, Plummer filed a petition for writ of habeas corpus in the district court. The district court dismissed the petition for failure to exhaust state court remedies. Plummer filed a motion for relief from judgment in the state trial court on March 10, 2003, raising claims of ineffective assistance of counsel and newly discovered evidence. The state trial court denied his claims, as did the Michigan Court of Appeals and the Michigan Supreme Court.

In November, 2006, Plummer again filed a petition for a writ of habeas corpus in district court, claiming, among other things, ineffective assistance of trial counsel. The district court issued an order denying the petition and denying a certificate of appealability. Plummer filed motions for reconsideration and for a certificate of appealability, all of which were denied by the district court. Plummer requested a certificate of appealability from this Court. His request was granted. On appeal, Plummer argues that his trial counsel was constitutionally ineffective because defense counsel promised the jury in voir dire that Plummer would testify in support of a theory of self-defense, even though Plummer ultimately chose not to testify.

(Doc. 39 at 3-5). The Sixth Circuit held that this court erred by not holding an evidentiary hearing on the issue of whether Plummer told his trial counsel that he did not want to testify prior to voir dire, vacated this court's judgment, and remanded the case.

-6-

B.     The Evidentiary Hearing

On January 10, 2013, this court held an evidentiary hearing.  At the hearing, Plummer was represented by counsel from the Federal Defender's Office.  Plummer and his father testified at the hearing.  Respondent produced a transcript and the DVD of the video deposition testimony of Plummer's trial counsel, McDowell.  After the hearing, the parties deposed Jesse and submitted a transcript and video of his deposition.  The testimony of the four witnesses is summarized below.

1.     Robert McDowell

McDowell testified that he was sworn in as an attorney on November 30, 1966, thus, beginning a legal career spanning over forty years.  (Transcript of Deposition of Robert McDowell, November 16, 2012, Ex. 101b at 5).  He first served on active duty in the United States Air Force at England Air Force Base, Louisiana and shortly thereafter was assigned to the Philippine Islands as a trial attorney in the United States Air Force Staff Judge Advocate's Office where his work was ninety-nine percent criminal, some as prosecutor and some as defender.  Id. at 5, 18.  Following his service in the military, he served as an Assistant States Attorney in Cook County, Illinois, later served in that same capacity in Berrien County, Michigan, and then as Chief Assistant Prosecutor there.  Id. at 5.  Following his time as a prosecutor, he went into private practice, which included criminal defense work.  Id.  In 1985, his law firm was awarded the Indigent Defense Counsel in Berrien County.  Id.  As a result, his firm, and him individually, tried many criminal cases.  Id.  At the time of Plummer's trial, McDowell devoted about seventy-five percent of his practice to criminal defense work.  Id. at 7.  Of his many

criminal trials, McDowell estimates that he has handled about 25 murder trials.  Id. at 19.

Although McDowell handled many criminal defense cases over a long career, he distinctly remembered Plummer's case because it was unusual for someone in Plummer's occupation and station in life to be charged with murder resulting from a bar shooting.  Id. at 8.  Plummer's father was a minister, Plummer was married, and Plummer had served in the military before working in the federal penal system.  Id. McDowell remembered Plummer's description of the bar shooting with great clarity.  He testified that Plummer told him that he went to a bar in Niles with his brother Mark.  Id. at 9.  While there, some guy in the bar accused Mark of "looking at his woman," whereupon one of the guys hit Mark causing him to go down, and then two other men "jumped" him.  Id. at 9-10.  McDowell testified that Plummer told him that he was afraid the guys, who were considerably larger than his brother, were going to kill him, so he pulled his gun, fired it, and shot the main perpetrator.  Id. at 9.  McDowell further testified that he would never have pursued a theory of self-defense unless McDowell told him that he fired his gun.  Id. at 27.  McDowell further testified that he discussed the fact that it would be in Plummer's best interests to testify at trial to put forth the theory of self-defense.  Id. at 11.  On at least one occasion when he visited Plummer in prison, he brought a copy of the jury instruction with him that would be used under the theory of self-defense.  Id.  McDowell also testified that he told Plummer the only way to get his self-defense theory admitted was to take the stand.  Id.

McDowell also testified that in preparation for trial he talked on the telephone to Plummer's character witnesses.  Id. at 13.  He further testified that he had no idea that

-8-

Plummer would back out of his commitment to take the stand, otherwise he would never have promised his testimony during voir dire. Id. at 14. McDowell remembered that prior to trial, he told Plummer's father and wife that he would be proceeding under a theory of self-defense and remembers that they had no reaction when he told them that. Id. at 21. McDowell also testified that on the third day of trial, Plummer told him that he no longer wanted to testify after discussing and praying over the matter with his father and wife. Id. at 29. McDowell testified that he told Plummer he was making a mistake, that he would lose the self-defense jury instruction, and lose the opportunity to present character witnesses. Id. at 29-30. Plummer ignored his advice. Id.

    2.   <u>Robert L. Plummer (Plummer's father)</u>

Robert Sr. testified that when Plummer was first incarcerated after the bar shooting, he spoke to his son on the telephone, and his son denied firing a gun at all. (Doc. 49 at 10-11). He paid the retainer fee for McDowell and testified that he never discussed a theory of self-defense with McDowell. Id. at 11-12. Robert Sr. testified that he appeared for pretrial motions and the trial, but denied hearing McDowell tell the jurors during voir dire that Plummer acted in self-defense. Id. at 20. Later, he testified that he could not recall if he heard McDowell tell the jurors that Plummer acted in self-defense. Id. at 21. He further testified that he talked to his son in lockup during the lunch break on the third day of trial, and that his son told him he did not fire the gun and would not take the stand under a theory of self-defense. Id. at 23. He testified that this was his only conversation with his son regarding whether or not he would testify. Id. at 19. During the evidentiary hearing, the government gave Robert Sr. a copy of the sentencing transcript which included statements he made at the sentencing hearing.

Id. at 25.  Nowhere in that transcript did Robert Sr. complain about McDowell or about the defense being self-defense.  Id.  Robert Sr. further testified that he was not present during McDowell's meetings with his son, and that he did not know what they had discussed.  Id. at 26-27.

   3. <u>Robert Gerard Plummer</u>

   Plummer testified that when he was arrested, James Jesse was appointed as his counsel.  Id. at 35.  He testified that he was unhappy with Jesse's representation and filed an attorney grievance against him.  Id. at 36.  He further testified that he told Jesse that he never fired the gun.  Id. at 39.  After his father retained McDowell for him, he testified that he repeatedly asked McDowell to obtain discovery in regards to ballistics tests.  Id. at 40-41.  Plummer also testified that the issue of whether he would be asserting a theory of self-defense was raised at a pretrial hearing, on March 25, 1996, where the attorneys discussed the prosecutor's intent to introduce 404(b) evidence that Plummer had an earlier incident at the bar involving possession of a firearm.  Id. at 41-42.  Plummer testified that when McDowell raised the defense, he asked him about it, but McDowell told him to be quiet.  Id. at 42.  Plummer further testified that between the March 25,1996 hearing, and the start of his trial on April 9, 1996, he had a telephone conversation with McDowell wherein he told McDowell that he did not want to proceed under a theory of self-defense, but his attorney told him that it was the "best strategy." Id. at 43.

   Plummer further testified that he never tried to alert the trial court that he was dissatisfied with McDowell because McDowell "told me don't say anything.  If you have anything to say, just tell it to me, and I'll take care of it.  I'll get with the judge.  That's

what he told me." Id. at 44.  Plummer further testified that once voir dire began and

McDowell told the jurors that Plummer acted in self-defense, "I raised my hand again,

and he looked at me and basically said the same thing that he said the first time.  He

said, you don't want – at this time you don't want to 'T' the judge off.  Just be quiet.

You don't want to make him mad because he will run you out of the courtroom, and

we'll just have the trial without you.  I remained silent." Id. 45.  Plummer also admitted

that when the trial court questioned him with regard to whether or not he wanted to

testify he did not say anything about McDowell raising the self-defense theory without

his approval. Id. at 46.  At the evidentiary hearing, Plummer admitted that at

sentencing he complained about the police department, the prosecutor, and some of

the prosecutor's witnesses, but he never complained about McDowell and in fact,

thanked him for his time and patience.  Id. at 50-51.  Plummer also admitted that after

the trial he filed several motions for new trial, including one filed *pro se*, and none of

those motions complained about McDowell's performance.  Id. at 51-52.  At the

evidentiary hearing, the government pointed out an inconsistency in Plummer's

testimony.  Specifically, in Plummer's objections to the report and recommendation, he

claimed that prior to trial, McDowell *never* discussed with him the issue of whether he

should testify, but at the evidentiary hearing, Plummer testified that McDowell

consistently pressured him to testify. Id. at 56-57.  When confronted with this

inconsistency, Plummer had no explanation. Id.  Plummer admitted that he never filed

an attorney grievance against McDowell. Id. at 55.  Plummer further testified that he

and his father gave McDowell the names of character witnesses. Id. at 58.

4.     <u>James Jesse</u>

After the evidentiary hearing, the parties deposed James Jesse, the court appointed attorney first assigned to Plummer, and submitted a transcript and video of the deposition.  (Doc. 59, Ex. 109).  Jesse has been a criminal defense attorney for 43 years.  <u>Id.</u> at 4.  At his deposition, Jesse testified that he had reviewed his file but did not have any notes of his two jail house meetings with Plummer.  <u>Id.</u> at 5.  He testified that he did not recall Plummer telling him that he had fired the shots that killed the decedent and injured another victim, but that if Plummer had told him that, he probably would have asked questions differently at the preliminary hearing.  <u>Id.</u>  He further testified that they did not get far enough along in the case to discuss whether or not Plummer would testify.  <u>Id.</u> at 7.

<u>STANDARD OF LAW</u>

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), this court must review state court decisions using the standard of review enacted and codified at 28 U.S.C. § 2254(d). Section 2254(d) states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

-12-

28 U.S.C. § 2254(d).  A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 413 (2000).  A state court's decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Id. at 410 (emphasis in original).  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409.   "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence."  Baze v. Parker, 371 F.3d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)).

"[W]here the state court has not articulated its reasoning, federal courts are obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented."  Harris v. Stovall, 212 F.3d 940, 943 (6th Cir. 2000).  This independent review is not a full, de novo review, it remains deferential to the state court's decision "because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA."  Williams v. Anderson, 460

-13-

F.3d 789, 796 (6th Cir. 2006).  Thus, where a state court decides a constitutional issue

by form order without an explanation for its decision, as the state courts did in reviewing

petitioner's conviction and sentence on direct appeal, the district court should focus on

the result of the state court's decision, applying the standard mentioned above.  Harris,

212 F.3d at 943, fn. 1.

ANALYSIS

The familiar two-prong test of Strickland governs the analysis of Plummer's

ineffective assistance of counsel claim.  The first prong requires petitioner to show that

his counsel's representation "fell below an objective standard of reasonableness."

Strickland v. Washington, 466 U.S. 668, 688 (1984).  The court "must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged conduct might be considered sound trial

strategy." Id. at 689 (citation omitted).

The second prong requires Plummer to show that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.  A reasonable probability is a probability sufficient to

undermine confidence in the outcome." Id. at 694.  When analyzing a claim of

ineffective assistance of counsel, the court "must indulge the strong presumption" that

counsel "made all significant decisions in the exercise of reasonable professional

judgment." Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011) (citation omitted).

Surmounting this "high bar is never an easy task," and a court must apply this standard

"with scrupulous care." Id. at 1408 (citation omitted).

Federal Courts of Appeal have held that absent unforeseeable events, an attorney's failure to present testimony which is promised during opening statements "may be unreasonable, for 'little is more damaging than to fail to produce important evidence that had been promised in an opening.'" U.S. ex rel. Hampton v. Leibach, 347 F.3d 219, 257 (7th Cir. 2003) (citing Anderson v. Butler, 858 F.2d 16, 17 (1st Cir. 1988)).

In English v. Romanowski, 602 F.3d 714, 728 (6th Cir. 2010), the Sixth Circuit held that the defense attorney acted unreasonably when he promised testimony from a third-party witness during his opening statement and later abandoned that strategy. The court reasoned that had the attorney fully investigated the witness and her story prior to opening statements, he would not have promised to call her as a witness. Id.

Even more prejudicial is when defense counsel fails to fulfill the promise of testimony from a defendant himself. Hampton, 347 F.3d at 257.  In Hampton, the trial counsel promised testimony from defendant, but during trial, expressed to his client "the possibility that his testimony might aggravate the possibility of the jury thinking him guilty by association." Hampton, 347 F.3d at 258.  The court found that although the attorney's *advice* to his client may have been reasonable, it was nonetheless unreasonable for the attorney to promise testimony to the jury when "the circumstances that gave [the attorney] pause were entirely foreseeable at the time he made his opening statement." Id.

Similarly, in Ouber v. Guarino, 293 F.3d 19 (1st Cir. 2002), where the trial court conducted three trials (the first two trials resulted in deadlock), the court found unreasonable error by defendant's counsel. Id. at 22.  During opening statements for

the third trial, defendant's counsel promised *four* times that defendant would testify, framing her testimony as the centerpiece of the defense.  Id.  During trial, however, the attorney became concerned with defendant testifying and persuaded her not to, without advising her that such a decision may be "counter-productive in light of those promises."  Id. at 24.  The court held that because there were not any "unforeseeable events forcing a change in strategy, the sequence [of events] constituted an error in professional judgment."  Id. at 27.

Based on the evidence submitted and the testimony presented at the evidentiary hearing, the court is convinced that the facts of the instant case are significantly different from Ouber and Hampton, in that McDowell was faced with "unforseen circumstances" which warranted a change in trial strategy and a break in his promise that the jury would hear testimony from Plummer.  Based on Plummer's testimony and demeanor at the evidentiary hearing, the court does not find his self-serving testimony credible.  The court does, however, credit McDowell's testimony, not only because of his extensive trial background, but also because of his detailed recollection despite the case being litigated over 17 years ago.  McDowell explained the case was memorable in part because of facts surrounding Plummer's background, including his steady job at a prison facility, military service and his religious upbringing. (Ex. 101b at 8).

Robert Sr. testified that he did not witness any conversations between Plummer and McDowell, so he is unable to positively confirm what was exchanged between the two. (Doc. 49 at 27).  However, the court notes some inconsistencies between Robert Sr. and Plummer's testimonies, which influence the court's credibility determination.  In his testimony, Robert Sr. confirmed filing an affidavit with the trial court which stated

-16-

that McDowell told him the "defense would be self-defense." Id. at 17.  This statement,
however, is inconsistent with other testimony in which Robert Sr. states, "Mr. McDowell
never did tell me that he was running my son under self-defense." Id. at 24.

Additionally, Robert Sr. testified that during the lunch break on the third day of
trial, Plummer indicated to him, "I'm not taking the stand for self-defense, but I'll take
the stand for not guilty or innocent." Id. at 23.  Robert Sr.'s representation is
inconsistent with Plummer's claim that he never intended to testify, telling McDowell,
"the evidence will speak for itself." Id. at 39.  Lastly, it is obvious, but important, to note
that as Plummer's father, Robert Sr. has a strong interest in testifying in a manner to
assist his son in gaining release from prison. Id. at 27.

Plummer's testimony raises questions as well.  First, Plummer suggests that his
effort in obtaining the ballistics report, and in filing a grievance against Jesse for not
actively pursuing certain motions, is consistent with his claim that he always intended to
plead not guilty. Id. at 36.  The court, however, finds that this evidence speaks more to
the fact that Plummer did *not* actively voice any disagreement with McDowell's theory of
self-defense.  Plummer's actions in response to Jesse's representation indicate he was
aware of the case proceedings and their consequences.  It seems unlikely that
Plummer would so aggressively defend himself with respect to the individual motions,
"motion for discovery inspection, motion to quash and to strike certain evidence,
and...retest[ing] the weapon for bullet and shell cases," but not voice his concerns with
McDowell's theory of self-defense. Id. at 36.  Plummer even filed a motion for
discovery and inspection in pro per when Jesse failed to do so. Id. at 37.  Thus,

Plummer's *inaction* following McDowell's announcement of self-defense during a pre-trial motion discredits the claim that Plummer always intended to plead not guilty.

Plummer tried to reason that following McDowell's statement, McDowell told him to keep quiet until the hearing finished.  Id. at 42.  Nothing in the trial transcript supports this allegation.  Plummer claims he did not voice his concerns on the record because McDowell told him, "[i]f you have anything to say, just tell it to me, and I'll take care of it. I'll get with the judge."  Id. at 44.  This testimony is incredulous given his history and manner of addressing matters while represented by Jesse.

After his conviction, Plummer filed objections to the magistrate judge's report and recommendation regarding his petition for a writ of habeas corpus.  In it, Plummer claims that McDowell *never* discussed with him the issue of testifying.  Id. at 54.  He claims that this was not a situation where he changed his mind about testifying, but rather, "when the time arose for him to make a decision whether to testify or not, he opt [sic] not to testify."  Id.  Interestingly, Plummer also submitted an affidavit which directly contradicts this allegation.  In the evidentiary hearing, Plummer confirmed that his affidavit states McDowell "kept pressuring" him to testify.  Id. at 53.  This pressuring occurred "before and during trial."  (Doc. 11 at 43).  Plummer's inconsistent statements lead the court to conclude his story is not credible.

Another example of such an inconsistency relates to Plummer's position on whether or not he fired his .25-caliber pistol on the night of the incident.  Plummer maintains he never consented to argue self-defense because he never fired his pistol. He offers that his insistence in requesting the ballistics report supports that position. However, McDowell provides contradicting testimony in his deposition.  He states that

-18-

when he discussed the ballistics report with Plummer, and told Plummer that despite confirming his pistol had been discharged, it was uncertain whether his pistol shot anybody, Plummer allegedly responded that his bullet may have hit the ceiling of the bar. (Ex. 101b at 15). Giving weight to McDowell's testimony, the court can only conclude that Plummer's assertion that he never fired his pistol on the night in question is inaccurate based on McDowell's recollection of Plummer providing a justification for the findings of the ballistic report.

McDowell states that Plummer first indicated his refusal to testify on the third day of trial, nearly a month after the pre-trial motion where McDowell announced his theory of self-defense. (Ex. 101b at 28). According to McDowell, Plummer stated that he and his father prayed about it during that day's lunch break and felt God did not want him to testify. Id. at 30. McDowell then asked the trial court to question Plummer directly regarding his decision "so that we don't have a problem later." (Doc. 52 at 6). The trial court did address Plummer and explained his right to testify and confirmed that Plummer did not wish to take the stand. (Doc. 49 at 45). At this time, the court also asked Plummer if he was satisfied with McDowell's representation, and Plummer responded, "yes." Id. at 47. On cross-examination during the evidentiary hearing, Plummer tried to explain, "[y]es, I was satisfied as being my attorney, but not theory, no. I was not satisfied." Id. Plummer's artful explanation appears to be nothing more than damage control. Additionally, Plummer's story lacks credibility considering his past behavior. It seems apparent from his conduct throughout the pretrial process that had he disagreed with the theory of self-defense, he would have voiced his concerns in any number of ways.

-19-

McDowell's request that the trial court confirm Plummer's decision not to testify was also focused on recording the potential ramifications for that decision. (Doc. 52 at 10). McDowell states he had advised Plummer he would need to testify in order for his character witnesses to testify. Id. When the court repeated this to Plummer, he affirmed his understanding. Id. Notably, it was Plummer and Robert Sr. who gave the names of the character witnesses to McDowell. (Doc. 49 at 58). Plummer's assertion that he never intended to testify is thus further discredited because his own testimony was required to admit these witnesses.

McDowell's actions and statements leading up to the third day of trial also strike this court as being consistent with representing a client who wished to testify in self-defense. He stated that self-defense was his theory from the beginning noting that "it jived with the facts in the police report." (Ex. 101b at 25). Additionally, McDowell clearly stated in his deposition, "If I don't have a commitment from [the defendant] to testify then I don't bring that up" to jurors. Id. at 26. The court finds his statements regarding his approach to the case and his address to the jury as credible.

McDowell also based his jury selection in part on the theory of self-defense, identifying jurors who "do not disbelieve somebody 'cause he was in a bar, or drinking, or may have been partially under the influence, or be shocked by the prospect that maybe somebody was looking at somebody else's woman." (Ex. 101b at 22). There was even a witness who testified that when Plummer shot the decedent he had a look of bewilderment on his face, which, as McDowell expressed, supported the theory of self-defense. Id. at 25-26.

-20-

Lastly, following Plummer's conviction, there are at least two instances where Plummer would have likely voiced his concerns about the theory of self-defense, but instead elected not to. During his sentencing, Plummer informed the court he felt the Niles Police Department and the prosecutor handled things improperly, and complained about testimony from some of the prosecution witnesses. (Doc. 49 at 50). Notably, Plummer did not raise any concerns with McDowell's performance, but rather chose to thank him for his time and patience. Id. Next, several motions for a new trial were filed on Plummer's behalf, including one he filed *in pro per*. Id. at 51. These motions contained "various complaints about the trial and how it was handled," but was void of any complaint against McDowell and the theory of self-defense. Id. The court finds this weighs against his credibility when he later raised the issue on appeal.

On April 23, 2013, this court granted Plummer's motion for discovery limited to the purpose of taking the deposition of Jesse, Plummer's original attorney in this matter. (Doc. 58). Plummer claims that Jesse's testimony corroborates with Plummer's contention that he never admitted to firing his gun, and always intended to plead not guilty. Indeed, Jesse testified that he did not *recall* ever hearing Plummer indicate he fired the shots that caused injuries to the victims. However, Mr. Jesse's testimony does not bear the same weight as McDowell's because Jesse was not Plummer's attorney during the relevant time period, when McDowell promised testimony from Plummer. McDowell's testimony establishes that Plummer changed his mind if, in fact, he did tell Jesse that he did not shoot the gun.

The court concludes that based on the evidence provided, both Plummer and McDowell planned on Plummer testifying that he acted in self defense and constructed

their entire defense on that theory.  When McDowell told the jury during voir dire that Plummer would be arguing self-defense, and promised testimony from Plummer, McDowell reasonably believed that Plummer intended to testify.  Therefore, Plummer's change of heart created an "unforseen circumstance" which warranted McDowell's change in trial strategy, and ultimately, a broken promise to the jury.  A broken promise under such circumstances does not constitute unreasonable error as detailed in <u>Ouber</u>. 293 F.3d at 27.  In addition, Plummer made his decision not to testify with a full understanding of the consequences.  Accordingly, the broken promise also does not constitute representation which "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688.

The court also finds that Plummer's claim of ineffective assistance does not meet the second prong of the <u>Strickland</u> test.  First, the Sixth Circuit opined that prejudice may have been present if McDowell's broken promise to the jury was unreasonable error. (Doc. 39 at 14-15).  However, because this court finds that McDowell's broken promise was not unreasonable based on the unforseen circumstances he faced, any such prejudice resulting from the broken promise did not result from *counsel*, as the <u>Strickland</u> test requires. <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993).

Second, the court looks to substantial evidence from the trial record which suggests Plummer did not suffer prejudice from the broken promise because he would still likely have been convicted had McDowell not argued self-defense or promised Plummer's testimony.  The Sixth Circuit stated "the evidence of Plummer's guilt was not overwhelming on its own," and that certain evidence may have better served Plummer's interest had McDowell not raised self-defense.  (Doc. 39 at 15-16).  However, as

previously discussed, McDowell's change in defense theory was not caused by his own error, but rather, the unforseen circumstance of Plummer changing his mind. The trial court provided jury instructions to cure any defects arising from the attorney's statements during voir dire and Plummer's decision not to testify. (Doc. 52 at 23). Additionally, as in any criminal case, the trial court highlighted the fact that it is the prosecutor's burden to prove each required element beyond a reasonable doubt. Id. This court must presume that a jury will follow the instructions provided by the trial court. Weeks v. Angelone, 528 U.S. 225, 234 (2000). Further, the prosecution presented multiple eyewitnesses who testified seeing Plummer with a gun in his hand, and two witnesses who testified that they saw Plummer shoot the decedent. Plummer, 581 N.W.2d at 755. Plummer stated that his gun stayed in his holster the entire evening, but that when he was pushed to the ground outside the bar, the gun fell to the ground. (Doc. 49 at 34-35). This statement is contradicted by evidence presented which reflects that Plummer threw his gun underneath a car when a police officer stopped him. Plummer, 581 N.W.2d at 756.

Lastly, although the firearms expert could not confirm the bullets from the scene were fired from Plummer's .25-caliber pistol, he did testify that "there were 'gross similarities' between the markings observed on the spent shell casings found at the scene and those observed on the casings subsequently fired from the suspect pistol." Id.

Because the trial record includes significant pieces of evidence which point to Plummer's guilt, and because this court does not find unprofessional error on McDowell's behalf, Plummer is unable to demonstrate "that there is a reasonable

-23-

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253.  Rule 11 of the Rules Governing Section 2225 Proceedings, which was amended as of December 1, 2009, requires that a district court issue or deny a certificate of appealability when it enters a final order.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue.  28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); In re Certificates of Appealability, 106 F.3d 1306, 1307 (6th Cir.1997).  Because Plummer has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue.

CONCLUSION

For the reasons stated above, Plummer's petition for a writ of habeas corpus is hereby DISMISSED, and a certificate of appealability is hereby DENIED.

IT IS SO ORDERED.

Dated:  August 6, 2013

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 6, 2013, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk